**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CASEY H.,[1]                    ) Case No. EDCV 18-0116-JPR
                                )
              Plaintiff,        )
                                ) **MEMORANDUM DECISION AND ORDER**
         v.                     ) **AFFIRMING COMMISSIONER**
                                )
NANCY A. BERRYHILL, Acting      )
Commissioner of Social          )
Security,                       )
                                )
              Defendant.        )
_____ )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed September 18, 2018, which the Court has taken under submission without oral

_____

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

argument. For the reasons stated below, the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1969. (Administrative Record ("AR") 164.) He has a high school diploma (id. at 33) and last worked as a truck driver (id. at 32).

On July 19, 2013, Plaintiff applied for DIB and SSI, alleging that he had been unable to work since June 20, 2013, because of injuries to his lower back. (AR 57-58, 65-66, 164, 167, 172.) After his applications were denied initially and on reconsideration (id. at 57-74, 75-98), he requested a hearing before an Administrative Law Judge (id. at 118-19). A hearing was held on October 7, 2016, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (Id. at 30-51.) In a written decision issued November 18, 2016, the ALJ found Plaintiff not disabled. (Id. at 15-23.) He sought Appeals Council review (id. at 163), which was denied on December 4, 2017 (id. at 1-6). This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It

is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A. The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful

3

activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, he is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.
That determination comprises the fifth and final step in the
sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);
<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

  B. <u>The ALJ's Application of the Five-Step Process</u>

  At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since June 20, 2013, the alleged
onset date. (AR 17.) At step two, he concluded that Plaintiff
had the following severe impairments: "strain/sprain of the
lumbar spine with superimposed upon 3mm disc bulge with
degenerative disc disease, annular tear, and mild facet
arthropathy and mild endplate degenerative changes[.]" (<u>Id.</u>
(citing §§ 404.1520(c) & 416.920(c)).) At step three, the ALJ
determined that Plaintiff's impairments did not meet or equal a
listing. (AR 17.) At step four, he found that Plaintiff had the
RFC to perform a "less than sedentary" exertional level of work:[3]

> Specifically, the claimant can lift and carry 10 pounds
> occasionally and 10 pounds frequently. He can stand
> and/or walk for 2 hours out of an 8-hour workday, but

---

[3] "Sedentary work" is defined as

> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves
> sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties. Jobs are
> sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

§§ 404.1567(a) & 416.967(a).

requires the use of a cane for walking.  He can sit for 6 hours in an 8-hour workday.  The claimant cannot bend or stoop and he cannot climb ladders, ropes or scaffolds.  Additionally, the claimant is limited to routine and repetitive tasks due to the effects of narcotic pain medication.  The claimant may miss work twice per month due to his medical condition.

(AR 18; <u>see also id.</u> at 21.)  Based in part on the vocational expert's testimony, the ALJ found that Plaintiff could not perform his past relevant work.  (<u>Id.</u> at 21.)  At step five, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, he could perform at least two representative jobs in the national economy, both sedentary unskilled positions.  (<u>Id.</u> at 22.)  Thus, he found Plaintiff not disabled.  (<u>Id.</u> at 22-23.)

**V.  RELEVANT BACKGROUND**

A.  <u>Treating Physicians</u>

1.  <u>Dr. Bott</u>

On June 25, 2013, shortly after the alleged onset date, Plaintiff went to see Dr. Frank Bott[4] at the San Bernardino Medical Group for treatment of low-back pain.  (AR 267.)  Dr. Bott diagnosed "significant lumbar spasm with marked limitation in the motion of the low back."  (<u>Id.</u>)  He prescribed Vicodin[5] and recommended two weeks off work.  (<u>Id.</u>)  Dr. Bott noted that

---

[4] The record does not indicate Dr. Bott's medical specialty.

[5] Vicodin is used to relieve moderate to severe pain.  <u>See</u> <u>Vicodin</u>, WebMD, https://www.webmd.com/drugs/2/drug-3459/ vicodin-oral/details (last visited Oct. 29, 2018).  It contains an opioid (hyrdrocodone) and a nonopioid pain reliever (acetaminophen).  <u>Id.</u>  Hydrocodone works in the brain to change how the body feels and responds to pain.  <u>Id.</u>

6

Plaintiff was considering seeking permanent disability.  (Id.)

### 2.  Dr. Sowell

On July 1, 2013, Plaintiff went to see his primary-care physician, Dr. Bryan Sowell (AR 267-68), at San Bernardino Medical Group (id. at 268).  Dr. Sowell diagnosed acute lumbar spasm with degenerative disc disease and refilled his prescription for hydrocodone with acetaminophen.  (Id.)  Plaintiff declined physical therapy and stated that he was "planning on getting permanent disability."  (Id.)  He also underwent an x-ray of his lumbar spine, which showed "normal curvature and alignment," "intact" "pedicles and transverse processes," and "no spondylolysis or spondylolisthesis."  (Id. at 270.)  Overall his lumbar spine was "normal."  (Id.)

Plaintiff returned for a follow-up visit with Dr. Sowell on July 15, 2013.  (AR 269.)  Dr. Sowell noted Plaintiff's history of degenerative disc disease and normal lumbar-spine x-ray results.  (Id.)  He extended Plaintiff's time off work for another month, with a return-to-work date of August 19, 2013.  (Id.)  He also recommended Plaintiff see an orthopedist and return for a follow-up visit in five weeks.  (Id.)

### 3.  Emergency treatment

Plaintiff visited the Arrowhead Regional Medical Center twice in October 2013 for emergency treatment of his back pain.  (AR 287-88 (Oct. 11), 285-86 (Oct. 23).)  At both visits he sought to refill his Norco[6] prescription.  (Id.)  The handwritten reports of

---

[6] Norco is used to relieve moderate to severe pain.  See Norco, WebMD, https://www.webmd.com/drugs/2/drug-63/norco-oral/ details (last visited Oct. 29, 2018).  It contains hydrocodone. Id.

these visits are difficult to decipher, but it appears Plaintiff

was prescribed more Norco at the first such visit (AR 287) but his

request was refused at the second (id. at 286).

### 4. Dr. Goharbin

Plaintiff saw Dr. Amir Goharbin[7] at the Arrowhead Regional

Medical Center on October 24, 2013. (AR 293-95.) He reported

getting some relief of his symptoms with Vicodin, but his pain was

increasing as he gained weight. (Id. at 294.) He further

reported that he had "gotten physical therapy in the past, which

helped with his low back pain[.]" (Id.) Dr. Goharbin refilled

his Norco prescription, referred Plaintiff to physical therapy,

and told him to consider pain management or epidural steroid

injections if his pain did not improve. (Id.) Dr. Goharbin

recommended a follow-up visit in two months. (Id.)

Plaintiff went back to Arrowhead for treatment of his low-

back pain one month later, on November 22, 2013. (AR 301-02.)

The handwritten reports are illegible in parts, and it is

impossible to discern whether Dr. Goharbin was the treating

doctor. (Id.) Plaintiff's low-back pain was a "7" of 10. (Id.

at 301.) He said Norco relieved his pain and he did not want to

reduce its dosage, but he agreed to a pain-clinic referral. (Id.

at 302.)

On February 5, 2014, Plaintiff returned to see Dr. Goharbin.

(AR 306-08.) During this visit, he reported that he went to

physical therapy in December 2013 and experienced some relief of

---

[7] The record does not indicate Dr. Goharbin's medical
specialty.

8

his symptoms.[8]  (Id. at 307.)  Vicodin also helped relieve his

pain.  (Id.)  Dr. Goharbin prescribed more Vicodin and stressed

the need for continued physical therapy and anti-inflammatory

medication for pain control and long-term management.  (Id.)  That

same day, Plaintiff underwent another x-ray of his lumbar spine,

which showed normal disc spaces and facet joints.  (Id. at 300.)

On March 27, 2014, Plaintiff returned for a follow-up visit

with Dr. Goharbin.  (AR 312-13.)  He reported that Norco was the

only medication working to relieve his pain.  (Id. at 313.)  He

further noted that it "allow[ed] him to do his activities of daily

living."  (Id.)  Dr. Goharbin refilled Plaintiff's Norco

prescription and recommended that he bring his MRI disk to the

medical center to allow referral to a "pain specialist" or

orthopedic clinic as necessary.  (Id.)

On May 1, 2014, Plaintiff saw Dr. Goharbin for a Norco

prescription refill.  (AR 310.)  He "almost beg[ged]" Dr. Goharbin

for the refill and reported that Norco allowed him to "do his ADLs

without drowsiness[.]"  (Id.)  Dr. Goharbin told Plaintiff he

might have developed a Norco dependency and again urged him to

bring in his MRI to allow referral to a pain specialist.  (Id.)

Plaintiff agreed to do so (id.), but the record contains no such

evidence.  After Plaintiff "insisted numerous times," Dr. Goharbin

agreed to prescribe him additional Norco but explained that he

would no longer do so because of the dangers of prolonged use and

availability of other treatment options.  (Id.)

---

    [8] The medical records contain a single physical-therapy
report for one date of service, on December 26, 2013, at which
time Plaintiff discontinued the therapy because of pain.  (See AR
279-81.)

Plaintiff again returned to Arrowhead on June 6, 2014, for a follow-up visit. (AR 314-15.) As with the November 22, 2013 visit, the reports are illegible in places and fail to identify the treating physician. (Id.) Plaintiff claimed his back pain was at an "8" of 10 and was diagnosed with lumbago. (Id. at 314.) He requested an increase in his Norco prescription, which he reported allowed him to do his activities of daily living without constipation or drowsiness. (Id. at 315.)

### 5. Dr. Wang

Plaintiff began seeing Dr. Ying Fuh Wang[9] at the Pomona Community Health Center on April 30, 2015, to follow up on his complaints of back pain and to refill his medications. (AR 424-26.) He described his pain as severe and sought a letter for "DPSS." (Id. at 424.) Dr. Wang's assessment of Plaintiff's back pain was "stable" and "mildly improved [with] more walking." (Id. at 425.) Dr. Wang prescribed Norco, Flexeril,[10] and ibuprofen. (Id.)

Plaintiff returned to see Dr. Wang just over three months later, on August 5, 2015. (AR 427-29.) The doctor noted that without medication, Plaintiff was "able to walk a maximum of about 1/4 block[.]" (Id. at 427.) Dr. Wang refilled Plaintiff's medications and wrote a letter for possible "disability." (Id. at 419 (letter), 427 (treatment note indicating that Plaintiff

---

[9] The record does not indicate Dr. Wang's medical specialty.

[10] Flexeril (which has the generic name cyclobenzaprine) is a muscle relaxant used short term to treat muscle spasms. See Flexeril Tablet, WebMD, https://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details (last visited Oct. 29, 2018). It is usually used with rest and physical therapy. Id.

"need[ed] note for disability").)  This letter explained that
Plaintiff's "chronic back pain . . . limits his ability to walk
long distances" and that his September 3, 2013 MRI showed "lumbar
spondylosis at L4-L5, L5-S1, and a 4 mm disc protrusion at L5-S1."
(Id. at 419.)  It did not mention any other limitations or
impairments.  (Id.)

Two months later, on October 5, 2015, Plaintiff returned to
see Dr. Wang.  (AR 430-32.)  He described his back pain as "up and
down," with the medication helping but still necessary.  (Id. at
430.)  Once again Dr. Wang refilled Plaintiff's prescriptions for
Norco, Flexeril, and ibuprofen.  (Id.)

On June 13, 2016, Plaintiff returned to see Dr. Wang as a
follow up for lower-back pain.  (AR 446-48.)  Dr. Wang noted that
he refilled Plaintiff's Norco and ibuprofen and prescribed a new
medication, for insomnia.  (Id. at 447-48.)

6.  Dr. Jewell

On November 6, 2015, Plaintiff began seeing primary-care
physician Dr. David Jewell at Pomona (AR 40, 433-35) for follow-up
treatment of his chronic back pain (id. at 433).  Dr. Jewell noted
that Plaintiff had never undergone pain management or epidurals
and had one trial of physical therapy, which Plaintiff said made
the pain worse.  (Id.)  Plaintiff said his pain was "under good
control with Norco[.]"  (Id.)  Dr. Jewell's "Assessment/Plan"
indicated that Plaintiff's "pain seems controlled on low dose
narcotics" and that he should "[c]ontinue to keep pain management
in mind [and] consider epidurals if pain worsens."  (Id. at 434.)
Dr. Jewell prescribed Norco and ibuprofen, and he directed
Plaintiff to return for a follow-up visit in two months.  (Id.)

On January 6, 2016, Plaintiff again saw Dr. Jewell for low-back pain. (AR 436-38.) He stated that his pain was "[s]till relieved with Norco," but he was developing some sciatica in his left buttock. (Id. at 436.) Dr. Jewell noted that Plaintiff was not interested in receiving epidurals. (Id.) His "Assessment/Plan" indicated that he would recommend pain management if the pain worsened, and he prescribed Norco and ibuprofen. (Id. at 437-38.)

Also on January 6, 2016, after just his second visit with Plaintiff, Dr. Jewell completed a medical-opinion form provided by Plaintiff's counsel. (AR 402-04.) He indicated his "opinion" of Plaintiff's "ability to do work-related activities on a day-to-day basis in a regular work setting" by answering a series of questions. (Id.) Each answer consisted of checking a box, circling numbers, or filling in blanks. (Id.) Dr. Jewell indicated that Plaintiff could lift less than 10 pounds on an occasional and frequent basis (id. at 402); stand, walk, or sit for less than two hours during an eight-hour day (id.); sit for between 15 and 30 minutes before changing position (id.); and stand for five to 20 minutes before changing position (id.). In addition, Dr. Jewell opined that Plaintiff must walk around every 30 minutes for 15 minutes each time (id. at 403) and needed an opportunity to shift positions or lie down during a work shift every day (id.). In answer to the form's question, "What medical findings support the limitations described above?" Dr. Jewell answered, "MRI shows lumbar DDD[.]" (Id.) Dr. Jewell also checked a box indicating that Plaintiff would need to miss work more than three times a month because of his impairment. (Id. at

404.) Each of the limitations Dr. Jewell assessed was the most severe available on the form. (Id. at 402-04.) According to Plaintiff's testimony, he told Dr. Jewell how to answer each question, although it is not clear whether the doctor used those answers or provided his own. (Id. at 46-47.)

Plaintiff next returned to see Dr. Jewell two months later, on March 3, 2016. (AR 439-41.) He reported that his pain was "no worse but no better" and was "adequately controlled with his current meds," and he saw "no need" for a referral to pain management. (Id. at 439.) Dr. Jewell refilled his prescriptions for Norco and ibuprofen and noted that Plaintiff "state[d] his attorney had him do an MRI recently and he [would] get a copy of the report." (Id. at 441.) Dr. Jewell recommended a follow-up visit one month later. (Id.)

On April 8, 2016, Plaintiff again saw Dr. Jewell for an office visit. (AR 442-45.) He reported no significant change in his pain and said several surgeons told him his problems were not severe enough to require surgery. (Id. at 442.) He reported his pain as "0/10." (Id. at 443.) Dr. Jewell's "Assessment/Plan" indicated that Plaintiff should continue his current medications (which included Norco and ibuprofen) and schedule a follow-up visit in a month. (Id. at 444.)

B. Examining and Reviewing Physicians

1. Dr. Beck

Worker's-compensation physician Dr. John L. Beck, an orthopedic surgeon, examined Plaintiff for three hours on March 20, 2014, and produced a detailed 18-page report. (AR 378-95.) Dr. Beck's "objective findings" were "lumbar spondylosis at L4-L5

and L5-S1, 4 mm posterior disc protrusions and lumbar disc
displacements, back muscle spasms and inverterbral disc
degeneration." (Id. at 392.) He concluded that Plaintiff's "work
restrictions" were "limited standing, limited overhead work,
limited stooping and bending, limited kneeling and squatting,
limited neck and waist bending, no operation of heavy equipment
including driving, limited lifting over 10 pounds and limited
pushing/pulling up to 10 pounds." (Id. at 393.) He further
opined that Plaintiff needed to consider surgery and recommended
consultation with a "spine specialist." (Id.) As part of his
report, Dr. Beck completed a check-box summary of Plaintiff's
"Work & Functional Capacity Activity Estimation[.]" (Id. at 395.)
Dr. Beck checked a box on the form indicating that Plaintiff could
sit "frequently," which was defined as three to six hours. (Id.)

On January 27, 2015, Dr. Beck completed a five-page
supplemental report, updating his earlier findings after
evaluating Plaintiff's MRI results. (AR 373-77.) Dr. Beck
apparently consulted with a spinal orthopedic surgeon and
concluded that Plaintiff was not a candidate for surgery based on
his MRI results, which showed no herniated disc and an "annular
tear . . . clearly not as severe as anticipated." (Id. at 374.)
Any future care would be palliative and could include physical
therapy to strengthen Plaintiff's abdominal muscles and prevent
further injury. (Id. at 376.)

### 2. Dr. Taylor-Holmes

On April 21, 2014, Dr. G. Taylor-Holmes, a preventative-medicine physician,[11] assessed Plaintiff's injuries in connection with his DIB and SSI claims. (AR 60-64, 68-72.) Dr. Taylor-Holmes opined that Plaintiff was not disabled, as his RFC allowed him to perform "light" work.[12] (Id. at 63-64, 72.) Dr. Taylor-Holmes found that Plaintiff could sit for about six hours and stand or walk for about six hours during an eight-hour workday. (Id. at 61, 69-70.) No absenteeism limitation was addressed or found.

### 3. Dr. Goodrich

On September 18, 2014, Dr. Martha A. Goodrich, an internal-medicine physician,[13] assessed Plaintiff's impairments in

---

[11] Dr. Taylor-Holmes's electronic signature includes a medical-specialty code of 36, indicating a "[p]reventive [m]edicine" practice. (See AR 60, 68); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

[12] "Light work" is defined as

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

§§ 404.1567(b) & 416.967(b).

[13] Dr. Goodrich's electronic signature includes a medical-specialty code of 19, indicating an internal-medicine practice.

connection with the reconsideration of his DIB and SSI claims. (AR 79-85, 90-96.) She confirmed Dr. Taylor-Holmes's findings. (Id. at 81, 85, 92-96.) Thus, she concluded that his RFC allowed him to perform light work, and he was not disabled. (Id. at 84, 95.) Dr. Goodrich did not note any absenteeism limitation.

### 4. Dr. Karamlou

In August 2014, Dr. Azizollah Karamlou, an internal-medicine physician, examined Plaintiff at the request of the Department of Social Services. (AR 320-24.) Dr. Karamlou provided a detailed report on Plaintiff's back injury, including his medical history, his present condition, and a functional assessment. (Id.) Dr. Karamlou noted that Plaintiff was taking medication for pain management, had refused a nerve-block treatment because of possible side effects, and was able to walk without using a cane "for a short period of time" but needed a cane for "long distances." (Id. at 323.) Plaintiff had normal range of motion in all his lower extremities. (Id. at 322.) The doctor's functional assessment concluded that Plaintiff was able to sit, walk, and stand for six hours each in an eight-hour day. (Id.) No opinion was given as to Plaintiff's need to miss work.

### 5. Dr. Deckey

Plaintiff underwent an orthopedic consultation[14] with Dr. Jeffrey Deckey on September 5, 2014. (AR 397-401.) In his detailed five-page report, Dr. Deckey diagnosed Plaintiff with a

---

(See AR 83, 96); POMS DI 24501.004.

[14] The record does not indicate Dr. Deckey's medical specialty, but he was employed at an orthopedic specialty institute. (AR 397.)

degenerative disc and annular tear at L5-S1 and chronic low-back pain (<u>id.</u> at 400).  Having examined Plaintiff and reviewed the September 3, 2013 MRI, Dr. Deckey further concluded that Plaintiff was not a surgical candidate because he suffered no instability, leg pain, or stenosis.  (<u>Id.</u>)  Instead, Dr. Deckey recommended treating Plaintiff's back pain with core strengthening, low-back stabilization, a comprehensive weight-loss program, and pain management.  (<u>Id.</u>)

### 6.  <u>Dr. Watkin</u>

In his capacity as a worker's-compensation physician, Dr. George S. Watkin[15] performed an orthopedic evaluation of Plaintiff on October 26, 2015.  (AR 339.)  He examined Plaintiff for 30 minutes, reviewed Plaintiff's medical records, and produced a detailed 34-page report.  (<u>Id.</u> at 339-72.)  He noted that Plaintiff reported he had tried physical therapy, which "helped moderately," but had discontinued it because "it was too painful to his lumbar spine."  (<u>Id.</u> at 340.)  Plaintiff walked without "antalgic component"[16] and "performed a full squat" (<u>id.</u> at 363), and Dr. Watkin diagnosed him with "[s]train/sprain lumbar spine superimposed upon 3mm disc bulge with degenerative disc disease, annular tear, and mild facet arthropathy at L5-S1; 1 mm disc bulge with mild facet arthropathy at L4-5; L1-2 and L2-3 mild degenerative changes (MRI 11/12/15)" (<u>id.</u> at 365).  In describing

---

[15] The record does not indicate Dr. Watkin's medical specialty.

[16] A person walks with an "antalgic gait" when he limps to avoid putting pressure on a painful area in his foot, knee, or hip.  <u>See</u> <u>Antalgic Gait</u>, Healthline, https://www.healthline.com/health/antalgic-gait (last visited Oct. 29, 2018).

Plaintiff's required work accommodations, Dr. Watkin specified "a preclusion from heavy work, prolonged standing, and walking" but gave no sitting or absenteeism restrictions. (<u>Id.</u> at 368.) He recommended that Plaintiff be allowed orthopedic consultations, physical therapy, chiropractic care, medications, diagnostic studies, and possible surgery. (<u>Id.</u>) He suggested Plaintiff "remain under the care of" a pain-management specialist[17] to decrease his pain and improve functioning. (<u>Id.</u>)

C. <u>Plaintiff's Testimony</u>

Plaintiff testified that he could not work because of lower-back pain (AR 33) and had been living with his parents since around the alleged onset date (<u>id.</u> at 35). He used a cane to walk (<u>id.</u> at 34) and took Norco and ibuprofen to ease his pain (<u>id.</u> at 35). Without the use of those medications, Plaintiff would be bedridden. (<u>Id.</u>) He did not help his parents around the house (<u>id.</u> at 37) and often was in so much pain that he spent the day in bed watching television (<u>id.</u> at 38). He further testified that he could lift five pounds (<u>id.</u> at 36-37),[18] stand for up to two to three hours at a time (<u>id.</u> at 42), and sit for 30 minutes to two hours (<u>id.</u>).

**VI. DISCUSSION**

Plaintiff argues that the ALJ (1) improperly rejected certain findings of Dr. Jewell, a treating physician (J. Stip. at 5-7),

---

[17] The AR does not show that Plaintiff ever visited a pain-management specialist, and Dr. Watkin's comment was part of a paragraph with the heading "Future Medical Care." (AR 368.)

[18] Plaintiff subsequently clarified that he could lift a gallon of milk (AR 37), which weighs eight and a half pounds. <u>See</u> <u>Hernandez v. Colvin</u>, No. 1:12-CV-00330-SMS, 2013 WL 4041862, at *9 n.4 (E.D. Cal. Aug. 8, 2013).

and (2) failed to provide a clear and convincing reason for finding his testimony about his symptoms not fully credible (<u>id.</u> at 13-18).  For the reasons discussed below, remand is not warranted on either basis.

A.  <u>Reversal Is Not Warranted Based on the ALJ's Rejection of Dr. Jewell's Sitting and Absenteeism Limitations</u>

Plaintiff contends that the ALJ failed to provide a specific and legitimate reason for rejecting portions of treating physician Dr. Jewell's medical opinion, specifically his sitting and absenteeism limitations. (<u>See</u> J. Stip. at 6.)  The ALJ did not err as to the sitting limitation, and any error concerning absenteeism was harmless.

1.  <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither.  <u>See</u> <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  <u>Id.</u>; <u>see</u> §§ 404.1527, 416.927.[19]  But "the findings of a nontreating,

_____

[19] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017.  When, as here, the ALJ's decision is the Commissioner's final decision, the reviewing court generally applies the law in effect at the time of the ALJ's decision.  <u>See</u> <u>Lowry v. Astrue</u>, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); <u>Spencer v. Colvin</u>, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1,

nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see also Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only a "specific and legitimate reason" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31); see also Orn v. Astrue, 495 F.3d 625, 632-33 (9th Cir. 2007). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. §§ 404.1527(e), 416.927(e). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. Id.

Furthermore, "[t]he ALJ need not accept the opinion of any

2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to §§ 404.1527 and 416.927 are to the versions in effect from August 24, 2012, to March 26, 2017.

physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004). An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881 F.2d at 755. The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

    2. <u>Analysis</u>

    The ALJ gave "significant weight, but not full weight" to Dr. Jewell's medical opinions (AR 20), which included his indication on a check-box form that Plaintiff could sit for a maximum of less than two hours during an eight-hour workday (<u>id.</u> at 402) and would need to miss work because of his impairment more than three times a month (<u>id.</u> at 404). The ALJ also gave "significant weight" (<u>id.</u> at 20) to the opinions of worker's-compensation physicians Beck (<u>id.</u> at 373-95) and Watkin (<u>id.</u> at 339-72), consulting examiner Dr. Karamlou (<u>id.</u> at 320-24), and state-agency medical consultants Drs. Taylor-Holmes (<u>id.</u> at 60-64, 68-72 (initial review)) and Goodrich (<u>id.</u> at 79-85, 90-96 (reconsideration)). Four of those doctors opined that Plaintiff could sit for up to six hours during an eight-hour workday, but none of them provided any absenteeism limitation or even addressed that issue other than Dr. Jewell. (<u>See</u> <u>id.</u> at 20-21.) The ALJ explicitly declined to accept any

21

doctor's "single assessment" as to Plaintiff's RFC and instead "adopted those specific restrictions on a function-by-function basis that are best supported by the objective evidence as a whole." (Id. at 20). In addition, he explicitly considered "the entire record" (id. at 18), including Plaintiff's "medical record" (id. at 20), in determining his RFC.

### a. *Sitting Limitation*

The medical opinions of Drs. Beck, Taylor-Holmes, Goodrich, and Karamlou all contradict Dr. Jewell's less-than-two-hour sitting limitation. Accordingly, the ALJ was required to provide only a "specific and legitimate reason" for rejecting it. See Carmickle, 533 F.3d at 1164. He did so. As Plaintiff concedes, "the ALJ was aware that Dr. Jewell had limited [Plaintiff] to sitting no more than two hours." (J. Stip. at 6; see also AR 20 (ALJ explicitly citing that portion of Dr. Jewell's opinion).) He gave numerous reasons to support his finding that Plaintiff could sit for up to six hours a day. (See generally AR 18-20.) Although he did not explicitly link each particular reason to his rejection of Dr. Jewell's sitting limitation, the latter may be inferred from the ALJ's detailed recitation of substantial evidence in the objective record supporting his RFC determination. (See id.); Magallanes, 881 F.2d at 755.

The ALJ discussed four separate medical opinions that limited Plaintiff to sitting for six hours in an eight-hour workday. (See AR 20-21.) Each of those included detailed findings supporting the conclusions therein. (See id. at 373-95 (Dr. Beck), 60-64, 68-72 (Dr. Taylor-Holmes), 79-85, 90-96 (Dr. Goodrich), 320-24 (Dr. Karamlou).) Dr. Jewell's less-than-two-hour sitting

22

limitation was the sole such medical opinion and was provided on a check-box form with almost no explanation. (_Id._ at 402-04.) Indeed, Dr. Jewell based almost all Plaintiff's stated limitations on his 2013 MRI, which was taken shortly after his alleged onset date, and not on his examinations or other medical evidence, such as the more recent normal x-rays.[20] (_Id._ at 403.) Although Dr. Jewell was a treating physician, at the time he assessed Plaintiff's limitations he had seen him only twice. (_See id._ at 404, 433, 436.) As explained below, the ALJ was not required to accept his opinion on Plaintiff's sitting limitation in light of the meager support provided for that conclusion, the strong contrary evidence in the record, and the doctor's then-brief relationship with Plaintiff. _See_ _Thomas_, 278 F.3d at 957 (ALJ properly rejected treating doctor's form opinion that conflicted with his more recent examination notes and other medical opinions); _see also_ _Warner v. Astrue_, No. CV 08-6001 ST, 2009 WL 1255466, at *9-11 (D. Or. May 4, 2009) (ALJ's rejection of one doctor's stated limitation could be inferred from his adoption of four other doctors' less restrictive limitation).

As the ALJ noted, Dr. Jewell's limitations were inconsistent with his own treatment notes, which indicated that Plaintiff reported that his back pain was under control with medication. (_See_ AR 20 (citing _id._ at 433 ("pain under good control with Norco")), 436 ("pain [s]till relieved with Norco").) Yet Dr. Jewell indicated on the check-box form the most restrictive sitting limitation available: namely, that Plaintiff could sit for

---

[20] In fact, some evidence in the record indicates that Dr. Jewell simply filled out the form as Plaintiff directed him to. (_See_ AR 46-47.)

less than two hours in an eight-hour workday.  (<u>Id.</u> at 402.)  The
inconsistency was a proper basis for the limitation's rejection by
the ALJ.   <u>See</u> <u>Saelee</u>, 94 F.3d at 522 (ALJ properly disregarded
treating doctor's report when it varied from his treatment notes);
<u>O'Neal v. Barnhart</u>, No. EDCV 04-01007-MAN, 2006 WL 988253, at *8
(C.D. Cal. Apr. 13, 2006) (inconsistency between treating
physician's medical opinion and examination notes was specific and
legitimate reason for rejecting opinion).

    In addition, the ALJ noted that Plaintiff's July 1, 2013 x-
rays, taken just after his alleged onset date, "came back normal."
(AR 19.)  So did Plaintiff's second set of x-rays, taken February
5, 2014, which showed that his "disk spaces and facet joints
[were] normal."  (<u>Id.</u> at 300.)  Inconsistency with objective
medical evidence is a specific and legitimate reason for rejecting
a medical-source opinion.  <u>See</u> <u>Batson</u>, 359 F.3d at 1195 (lack of
"supportive objective evidence" and "contradict[ion] by other
statements and assessments of [plaintiff's] medical condition"
were "specific and legitimate reasons" to discount physicians'
opinions).  Although Plaintiff's September 3, 2013 MRI results
showed lumbar spondylosis (AR 19), four doctors — including two
who examined Plaintiff — opined even after considering those
results that Plaintiff could sit for up to six hours.  (<u>See</u> <u>id.</u> at
392 (Dr. Beck), 60, 68 (Dr. Taylor-Holmes), 79, 90 (Dr. Goodrich),
323 (Dr. Karamlou).)

    The record also shows that Plaintiff's most recent primary
treating physician, Dr. Wang, provided no sitting limitation in an
August 15, 2015 letter he wrote at Plaintiff's request to support
his disability claim.  (AR 419.)  Dr. Wang noted Plaintiff's

September 3, 2013 MRI results and indicated only that his back injury limited his ability to walk long distances. (<u>Id.</u>) The letter is inconsistent with Dr. Jewell's restrictive sitting limitation and further supports the ALJ's rejection of it, particularly given Dr. Wang's longer and more recent treatment relationship with Plaintiff. <u>See</u> <u>Batson</u>, 359 F.3d at 1195. Indeed, Dr. Jewell apparently merely filled in for Dr. Wang when he was unavailable for several months. (<u>See</u> AR 424-32 (records showing Dr. Wang treated Plaintiff from April to October 2015), 446-48 (and then again beginning June 2016), 50-51 (Plaintiff explaining that he saw Dr. Jewell while Dr. Wang was "working at another clinic").) Finally, the most recent treatment note in the record, from Dr. Wang, indicates that Plaintiff rated his pain at "0/10." (<u>Id.</u> at 443.)

For all these reasons, the ALJ did not err when he rejected Dr. Jewell's less-than-two-hour sitting limitation.

b.  *Absenteeism*

The ALJ concluded that Plaintiff "may miss work twice per month due to his medical condition" (AR 18), thus implicitly rejecting Dr. Jewell's more restrictive limitation of more than three absences a month (<u>id.</u> at 404). Dr. Jewell's opinion on Plaintiff's absenteeism was uncontradicted by any other medical-opinion evidence. Accordingly, the ALJ was required to provide a clear and convincing reason for implicitly rejecting the limitation. <u>See</u> <u>Carmickle</u>, 533 F.3d at 1164. Although he erred in failing to do so, any error was harmless.

As an initial matter, the ALJ was clearly aware of Dr. Jewell's absenteeism limitation, as he specifically asked the

vocational examiner about it.  (See AR 48-49.)  The VE testified
that Plaintiff could perform at least two jobs, addresser and
table worker, given his sedentary RFC.  (Id. at 48.)  The ALJ
asked if an individual could still perform those jobs while
missing work once or twice a month.  (Id. at 48-49.)  She
responded yes.  (Id. at 49.)  The ALJ next asked if there were any
jobs an individual could perform while missing work three times a
month.  (Id.)  She testified that there were not.  (Id.)  Thus,
the ALJ clearly considered and rejected Dr. Jewell's absenteeism
limitation.  This case is thus unlike those in which nothing in
the record indicated that the ALJ was even aware of the assessed
limitation.  See, e.g., Marsh v. Colvin, 792 F.3d 1170, 1172-73
(9th Cir. 2015) (remanding for additional explanation when ALJ
"totally ignored" treating doctor and his notes).

Here, the ALJ's reasons for rejecting the absenteeism
limitation are implicit in the record.  As explained above, the
ALJ gave "significant weight" to the state-agency physicians'
medical opinions.  (AR 20-21.)  Not one opined that Plaintiff
would need to miss any days of work from his impairment or on
account of treatment.  (Id. at 378-95, 373-77 (Dr. Beck), 60-64,
68-72 (Dr. Taylor-Holmes), 79-85, 90-96 (Dr. Goodrich), 320-24
(Dr. Karamlou), 339-72 (Dr. Watkin).)  Each of their medical
opinions was inconsistent with Dr. Jewell's highly restrictive
absenteeism limitation.  Such was also the case with Plaintiff's
x-rays, which the ALJ noted were "normal."  (Id. at 19.)
Inconsistencies between a treating physician's opinion and other
medical evidence meet the clear and convincing standard.  See
Defrees v. Berryhill, 685 F. App'x 556, 557 (9th Cir. 2017) (ALJ's

rejection of treating physician's opinion based on inconsistency with medical record met clear and convincing standard).

The ALJ also took note of Dr. Jewell's medical reports indicating that Plaintiff's pain was under control with medication (AR 20 (citing AR 433, 436)), as discussed above. Such findings are inconsistent with his selection of the most restrictive absentee limitation available on the check-box form. (Id. at 404.) Internal inconsistencies between a treating physician's opinion and his treatment notes meet the clear and convincing standard. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancy between treating physician's medical opinion and treatment notes was clear and convincing reason for ALJ's rejection of standing limitation); Pyle v. Comm'r of Soc. Sec., No. 2:16-CV-00172-JTR, 2017 WL 3484195, at *6 (E.D. Wash. Aug. 14, 2017) (ALJ appropriately gave little weight to treating doctor's medical opinion that was inconsistent with his treatment notes).

Furthermore, Dr. Jewell's opinion that Plaintiff would be absent from work more than three times a month because of his injury (AR 404) was inconsistent with other evidence in the record. Two treating physicians concluded that Plaintiff could return to work after short absences. (Id. at 267, 269.) Dr. Bott examined Plaintiff on June 25, 2013, just after his alleged onset date, and recommended two weeks off work. (Id. at 267.) Dr. Sowell, who treated Plaintiff on July 1 and 15, 2013, set Plaintiff's return-to-work date as August 19. (Id. at 269.) The short duration of these recommended absences is inconsistent with the need to miss work approximately once a week every month.

Accordingly, although the ALJ erred in not explicitly

rejecting Dr. Jewell's absenteeism limitation, any error was harmless.  See Robbins, 466 F.3d at 885 (stating that error is harmless if inconsequential to ultimate nondisability determination); Hollingsworth v. Colvin, No. 3:12-CV-05643-BHS (KLS), 2013 WL 3328609, at *5 (W.D. Wash. July 1, 2013) (ALJ's failure to address treating physician's opinion of claimant's functional limitation was harmless when record contained significant evidence supporting ALJ's determination that claimant was not disabled).

B.    The ALJ Properly Discounted Plaintiff's Testimony

Plaintiff claims the ALJ erred in partially rejecting his subjective symptom testimony.  (J. Stip. at 13-18.)  As set forth below, the ALJ provided ample support for his finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (AR 18-19).  Thus, remand is not warranted on this ground.

1.    Applicable law

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). In assessing credibility, the ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin.,

807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas</u>, 278 F.3d at 958-59.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959.

   2. <u>Analysis</u>

  Plaintiff argues that the ALJ merely recited the medical evidence of record and thus did not provide a clear and convincing reason for rejecting portions of his testimony.  (J. Stip. at 15.)  In fact, the ALJ provided several: Plaintiff's treatment was "essentially routine and conservative in nature," and "[t]he lack of more aggressive treatment or even follow-up with a pain management specialist suggests the claimant's symptoms and limitations were not as severe as he alleged" (AR 20); "the medical records reveal that the medications have been relatively effective in controlling claimant's symptoms" (<u>id.</u> (citing AR 433, 436)); and Plaintiff failed to follow up with recommended treatment (AR 20).

  First, conservative treatment is a clear and convincing reason for an ALJ to discredit a claimant's testimony regarding the severity of an impairment.  <u>Parra v. Astrue</u>, 481 F.3d 742, 751 (9th Cir. 2007).  As noted by the ALJ, Plaintiff's treatment was principally "low dose" narcotic pain management.  (AR 20; <u>see also</u> <u>id.</u> at 434 (Dr. Jewell noting that Plaintiff reported that his pain was controlled on low-dose narcotics).)  He was not a surgical candidate as he lacked instability, leg pain, or stenosis, and an examining orthopedist recommended only core strengthening, low-back stabilization exercises, a weight-loss program, and pain management.  (<u>Id.</u> at 19.)  Several of his

doctors specifically noted that his treatment was and should be "conservative." (See, e.g., id. at 269, 400.) Such treatment, particularly given the low dosages of the narcotic pain medication, qualifies as conservative. See Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) ("physical therapy and the use of anti-inflammatory medication, a [TENS] unit, and a lumbosacral corset" qualified as conservative treatment); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (narcotic medication, physical therapy, and single injection amounted to "conservative treatment").

Second, as the ALJ explained (AR 20), treatment notes from his own physicians confirmed that medication was effective in controlling Plaintiff's pain and allowing him to perform his activities of daily living (see id. at 294 (Oct. 24, 2013: Vicodin relieved his symptoms), 307 (Feb. 5, 2014: "medication allows him to do his ADLs"), 313 (Mar. 27, 2014: "Norco does help alleviate his pain and allows him to do his activities of daily living"), 310 (May 1, 2014: "medication allows him to do his ADLs"), 433 (Nov. 6, 2015: "pain under good control with Norco"), 436 (Jan. 6, 2016: pain "[s]till relieved with Norco"), 439 (Mar. 8, 2016: "Still feels [pain] is adequately controlled with his current meds and sees no need for [referral] for pain management.").[21] "Impairments that can be controlled effectively with medication

_____

[21] As noted, one of Plaintiff's treating doctors was concerned that he had developed Norco dependency (see AR 310), and that seems to be borne out by Plaintiff's repeated refusal to try other pain-management techniques because, he insisted, Norco resolved his issues and allowed him to perform his daily routine comfortably. This is, of course, inconsistent with his claims in conjunction with his DIB and SSI applications that he was disabled by pain.

are not disabling for the purpose of determining eligibility for
SSI benefits." Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d
1001, 1006 (9th Cir. 2006). To the extent the treatment notes
contradict Plaintiff's testimony, they're a sufficient basis for
rejecting it. Carmickle, 533 F.3d at 1161 (contradiction with
evidence in medical record is "sufficient basis" for rejecting
claimant's subjective symptom testimony); Morgan v. Comm'r of Soc.
Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding
"conflict between [plaintiff's] testimony of subjective complaints
and the objective medical evidence in the record" as "specific and
substantial" reason undermining credibility).

Third, the ALJ noted Plaintiff's repeated failure to follow
up on other consistently recommended treatments (AR 19-20), such
as physical therapy, pain management, and injections (see id. at
268 (July 1, 2013: declined physical therapy), 279-81 (Dec. 26,
2013: discontinued physical therapy even though it "helped
som[e]w[]hat wit[h] his mobility an[]d forward flexion" (AR 68,
307)), 310 (May 1, 2014: failed to take action needed to
participate in pain management and declined nonnarcotic treatment
options), 436 (Jan. 6, 2016: Plaintiff not interested in receiving
epidurals), 439 (Mar. 8, 2016: Plaintiff felt that pain was
"adequately controlled with . . . current meds" and saw no need
for pain management).) That Plaintiff essentially was treated
only with pain medication and did not pursue physical therapy,
specialized pain management, or injections was a clear and
convincing reason for discrediting his allegations of disabling
pain. See Tommasetti, 533 F.3d at 1039 (ALJ may discount
claimant's testimony in light of "unexplained or inadequately

explained failure to seek treatment or to follow a prescribed course of treatment"); SSR 16-3p, 2016 WL 1119029, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

Plaintiff also argues that the ALJ was required to consider his good work history as proof of his credibility. (J. Stip. at 17.) An ALJ may consider a claimant's prior work record when evaluating the credibility of his testimony. See Thomas, 278 F.3d at 958-59. Plaintiff cites no case law supporting his contention that the ALJ was required to do so. Instead, he relies on Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998), an out-of-circuit decision that does not support his contention. Rather, Schaal "uses permissive language indicating only that a 'good' work history 'may' help prove credibility." Smith v. Colvin, No. 2:11-CV-03045-KJN, 2013 WL 1156497, at *7 (E.D. Cal. Mar. 19, 2013) (quoting Schaal, 134 F.3d at 503) (rejecting plaintiff's contention that under Schaal ALJ was required to consider her good work history in evaluating credibility of her testimony). In any event, Plaintiff's history of working sporadically for 10 years, quitting for three, and then working on and off for the next two years before claiming disability (see AR 203-04; see also id. at 45, 166, 211, 213-15) was not so extraordinary as to tip the

balance in his favor.[22]  See <u>Thomas</u>, 278 F.3d at 959 (sporadic work history is clear and convincing reason for discounting credibility of subjective pain testimony); <u>Simmons v. Colvin</u>, No. EDCV 15-01865-SP, 2016 WL 6436829, at *8 (C.D. Cal. Oct. 31, 2016) (periodic gaps in plaintiff's earning history supported ALJ's negative credibility determination); <u>Williams v. Colvin</u>, No. 1:14-CV-0366-BAM, 2015 WL 5546920, at *1, 4 (E.D. Cal. Sept. 18, 2015) (plaintiff's sporadic work history, with periods of unemployment and part-time work, was proper reason for ALJ to reject his credibility).

Accordingly, the ALJ did not err in assessing Plaintiff's testimony.  As such, remand is not warranted.  <u>See</u> <u>Batson</u>, 359 F.3d at 1195; <u>Morris v. Astrue</u>, No. EDCV 08-71-PLA, 2009 WL 1357448, at *7 (C.D. Cal. May 12, 2009) (remand not warranted when ALJ properly discredited plaintiff's subjective pain testimony).

**VII. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[23] IT IS ORDERED that judgment be entered AFFIRMING

---

[22] Plaintiff claims that he "consistently worked from 1996 to 2007; became injured at work, and returned back from 2011 to 2013, for a total of 14 years."  (J. Stip. at 17 (citing AR 203-04).)  But the cited pages demonstrate that in many of those years Plaintiff barely worked.  For example, his income in 1998 was just over $7500, whereas the year before he made nearly twice that.  (<u>See</u> AR 203.)  And in 2002 and 2004 Plaintiff had barely any income.  (<u>See</u> <u>id.</u> at 204.)

[23] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

the Commissioner's decision, DENYING Plaintiff's request for remand or an award of benefits, and DISMISSING this action with prejudice.

DATED: October 29, 2018  _____

JEAN ROSENBLUTH
U.S. Magistrate Judge